IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAN CRISTOBAL ACADEMY, INC. and
DAVID C. JOHNSON,

    Plaintiffs,

v.                                                                 Civ. No. 10-1152 JH/WDS

TRANSITIONAL LIVING CORPORATION,
KENT SHERMAN, TED EARL, JIM
HANLEY and STEPHEN COLE,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff David C. Johnson's Motion for Partial Summary Judgment [Doc. 83] and Brief in Support thereof [Doc. 82]. Having reviewed the parties' submissions and the relevant law, the Court finds there are material facts in dispute and will therefore deny Plaintiff's Motion.

## FACTUAL BACKGROUND

Plaintiff San Cristobal Academy ("SCA") is an alcoholism and drug addiction recovery center in Taos County, New Mexico. *See* Doc. 91, ¶ 11. Plaintiff David C. Johnson is SCA's owner and operator. *See id.* Defendant Transitional Living Corporation ("TLC") operates an education facility in Arizona under the name Gatehouse Academy. *See id.* at ¶ 12; Doc. 94 at ¶ 12. Defendants Kent Sherman, Jim Hanley, and Stephen Cole are current officers and directors of TLC. *See id.* Defendant Ted Earl is a former officer and director of TLC. *See id.*

In February 2009, Defendant Earl contacted Plaintiff Johnson to ask about a possible acquisition of SCA by TLC. *See* Doc. 82 at 7, ¶ 5; Doc. 96 at 5, ¶ 5. The parties—excluding

Defendants Sherman and Cole, who did not participate—negotiated the proposed acquisition for months.  *See* Doc. 82 at 7, ¶ 6; Doc. 96 at 5, ¶ 6.  Eventually, the parties executed a Management Agreement, which was negotiated over the course of several weeks in August and September of 2009.  *See* Doc. 82 at 8, ¶ 9; Doc. 96 at 5, ¶ 9.  Defendants Hanley and Earl were primarily responsible for negotiating the terms on behalf of TLC.  *See* Doc. 82 at ¶ 10; Doc. 96 at 5, ¶ 10.

      A.      **The Management Agreement**

In relevant part, the Management Agreement provides that TLC's subsidiary, NewCo, "shall manage and continue to manage San Cristobal Operations until such time as TLC gives notice of termination of this agreement."  *See* Doc. 82-11 at 1-2.  To be included in NewCo's responsibilities were admissions, marketing, booking, financial control, supervision of the recovery program, hiring and supervision of all SCA personnel, maintenance of SCA properties, maintenance of licenses and governmental permits, and "generally all matters related to the existing and ongoing San Cristobal Operations."  *See id.* at 2.

According to the Management Agreement, Plaintiff Johnson "shall be the chairman of the board of directors of NewCo ..., reporting to the managing director of TLC."  *See id.*  In addition to his regular salary, Plaintiff Johnson

> shall be issued 25,000 TLC common shares, which shall be held by TLC in trust for him until the closing of the sale of TLC or substantially all of its assets.  Notwithstanding the said shares held in trust, Johnson will be entitled to vote the said shares and to receive any ordinary dividends paid thereon; however capital dividends or other capital distributions shall be held in the same trust along with the said shares.  Johnson has the right to exercise option to Sell shares at completion of Employment Contract at a minimum value of $24 per share or fair market value at time of material change in ownership of TLC, whichever is greater.

*See id.* at 3, ¶ 7.

Plaintiff Johnson seeks summary judgment on his claims relating to TLC's alleged failure to honor this stock option provision. *See* Doc. 83 at 1 ("This Motion for Partial Summary Judgment seeks resolution of discrete claims made by Plaintiff David C. Johnson related to a stock option that he is entitled to under the Management Agreement...."). Specifically, summary judgment is requested as to Plaintiff Johnson's claims of breach of contract (Count I) and fraud (Count II), as they related to the stock option. *See generally id.* Plaintiff Johnson seeks $600,000 in liquidated damages, plus attorneys' fees and pre-judgment interest. *See id.* at 3.

Defendants argue that disputed material facts preclude summary judgment relating to the stock option agreement. Chiefly, Defendants contend they always understood and intended that Plaintiff Johnson would have the power to exercise his stock options only after the sale of TLC to a third party. However, Defendant Hanley, the acting CEO of TLC at the time the Management Agreement was negotiated, testified in his deposition that Paragraph 7 of the Management Agreement reads as though Plaintiff Johnson was empowered to sell shares upon the completion of his employment with TLC, regardless whether TLC had been sold. Initially, Defendant Hanley confirmed he had received an email from Plaintiff Johnson dated August 17, 2009, stating in part:

> I would like to have 'Option' to sell shares at end of employment contract at predetermined minimum value. Currently it says that shares will be held in trust until Sale of TLC so it could include "and/or End of Employment Contract whichever comes first." Ted and I also discussed with John that a share value must be included, that was the $24 discussion.

Doc. 82-9 at 1. After reviewing the above-referenced email received from Plaintiff Johnson, Defendant Hanley testified as follows:

> Q. So as of August 17th, 2009, you, as CEO of TLC, knew that Mr. Johnson wanted the option to share—to sell his shares at the end of

> the employment contract; true?
> A. According to this, yes.
> Q. And you understand that that was different than—that that was a different concept than selling them at the time of a sale of TLC; true?
> A. Oh, different concept, yes, and so—and a rather startling concept, too, because it had never been—it was always assumed that the shares were to be part of a settle—to be issued at the time of—well, not so much issued, but the share issue would come into play at the time of sale.
> ...
> Q. But you at least understood, as of August 17th, 2009, that Mr. Johnson wished to have the option to sell his shares at the end of his employment contract, right?
> A. Well, I mean, I guess I'd have to say if I read it, it appears that I should know that, but I—kind of sitting here looking now, I—because at no time in my consciousness did I—did I ever think that that was the case.

Doc. 82-3 at 2-3 (pp. 29-31). Defendant Hanley also confirmed that he received an email dated September 4, 2009 from TLC's attorney concerning the Management Agreement. *See* Doc. 82-3 at 3 (p. 33) (referencing Doc. 82-7). As Defendant Hanley confirmed in his deposition, *see* Doc. 82-3 at 4 (p. 34), the September 4, 2009 email notes several changes to the proposed Management Agreement, including that "Johnson cannot sell his TLC shares until the sale of TLC or substantially all of its assets." Doc. 82-7. Consistent with this statement, the draft Management Agreement attached to the September 4, 2009 email states, in relevant part:

> In addition to the considerations above specified, Johnson shall be issued 25,000 TLC common shares, which shall be held by TLC in trust for him ~~pending substantial completion of his obligations hereunder and until the earlier of one day before~~ the closing of the sale of TLC or substantially all of its assets. Notwithstanding the said shares are held in trust, Johnson will be entitled to vote the said shares and to receive any ordinary dividends paid thereon; however capital dividends or other capital distributions shall be held in the same trust along with the said shares. ~~Johnson has the right to exercise option to Sell shares at completion of Employment Contract described in Paragraph #3 at a minimum value of $24 per share or fair market value at time of material~~

4

~~change of ownership of TLC, whichever is greater.~~

Doc. 82-7 at 5; Doc. 82-3 at 4 (p. 35).

After comparing the above draft with the final executed Management Agreement, Defendant Hanley testified as follows:

> Q. If you will turn with me, please, to the third page of that document and refer to paragraph 7, the last sentence. It reads, "Johnson has the right to exercise option to Sell shares at completion of Employment Contract at a minimum value of $24 per share or fair market value at the time of the material change of ownership of TLC, whichever is greater."
>     That is identical language to what we just saw in this draft, is it not, sir?
> A. Yes.
> Q. So you would agree with me, then, according to your prior testimony, that that sentence reads that Mr. Johnson had the right to sell his shares at the end of his employment contract; you would agree with me; true?
> A. That's what the—
>     MR. KELLER: Object to the form.
> A. That's what the—yes, the sentence is saying that.
> ...
> Q. You would agree with me, then, that the last sentence of paragraph 7 in Deposition Exhibit 24 gives Mr. Johnson the right to exercise his option to sell his shares at the end of his employment contract; true?
> A. Yes; however may I speak to that?
> Q. Your attorney will have an opportunity to ask you questions when I'm done—
> A. Oh, okay.

Doc. 82-3 at 4-5.

Defendants have not provided any documentation or testimony calling Defendant Hanley's testimony into question. Instead, Defendants argue that the parties entered into a full and final settlement and compromise of all claims, including Plaintiff Johnson's alleged stock options, on July 8, 2010. *See* Doc. 96 at 11. A couple of weeks thereafter, on July 26, 2010, Plaintiff Johnson sent the following email to Defendant Sherman:

> This email shall serve as notice that I (David G. Johnson on behalf of Foundations Management) release Transitional Living Corporation (TLC) of all outstanding Accounts Payable (excluding outstanding tax liabilities incurred during Management Contract term) in return for TLC releasing all current Lodge residents and Enrollment Contracts to SCA, Inc.

Doc. 82-15 at 1.  Defendant Sherman testified as follows regarding the July 26, 2010 email:

> Q. ...Would you please tell me every representation that Mr. Johnson made to you that led you to believe that the settlement that was ultimately reached included a waiver of his right to 25,000 shares of TLC common stock under the management agreement.
> A.  In the settlement discussions, before we reached it, as I understood it, as I previously testified in my previous testimony, the shares were not part of the settlement to begin with because there was no sale of TLC....
> Q.  Let me ask you this: Did you guys ever discuss those shares?  In talking about the AP and the Lodge residents, did y'all ever talk about those shares?
> A.  Dave and I?
> Q.  Yes, sir.
> A.  No.
> Q.  Ya'll didn't even discuss that, did you?
> A.  No.

Doc. 82-4 at 6 (p. 110-111).  Subsequently, Defendant Sherman added, "It was understood between our discussions, excluding any discussion about shares, that it was a finalization of a settlement between us."  *Id.* (p. 113).  Plaintiff Johnson disagrees, testifying by affidavit that, "I never agreed to release TLC of its obligation to honor my stock option."  *See* Doc. 82-1 at ¶ 21.

   Defendants further argue that Plaintiff Johnson breached the Management Agreement "by failing to perform his duties as Chairman of SCAMI [i.e., NewCo]."  *See* Doc. 96 at 14.  Additionally, Defendants contend that Plaintiff Johnson breached the duty of good faith and fair dealing, which can occur even in the absence of breach of an express contract provision.  *See id.* at 16.  "Because Johnson breached the Management Agreement before TLC terminated the

same, TLC had no continuing duty to transfer any shares of TLC stock to Johnson nor did Johnson have the right to exercise an option to sell the shares for a total of $600,000.00." *Id.*

Defendants' third argument against summary judgment on the contract claim (as it relates to the stock option) is that the Management Agreement is ambiguous; therefore, the Court must look outside the four corners of the contract to determine the parties' intent. *See* Doc. 96 at 17-18. In Defendants' view, the purpose of the Management Agreement was to facilitate the sale of TLC (incorporating SCA). *See id.* at 22. Acknowledging that "Paragraph 7 is poorly drafted," Defendants argue that their interpretation is consistent with the parties' intent "for Johnson to exercise his option only once TLC was sold." *Id.* at 23.

Fourth, Defendants argue that Plaintiffs misrepresented the condition of its program and program expenses, entitling Defendants to rescission, thereby "precluding Johnson's claim for TLC stock options." *See* Doc. 96 at 23-24.

### B.      Fraudulent Misrepresentation

Plaintiff Johnson argues that summary judgment should also be entered on his claim of fraud relating to the stock option. This argument is based largely on the testimony of Defendant Hanley, as follows:

> Q. ...Whether before or after the execution of the management agreement, did TLC ever intend to comply with its obligation to give Mr. Johnson the option to exercise his stock option at the end of his employment contract?
> A. We didn't see it as an obligation.
> Q. Well, you just testified to the judge and jury that the management agreement gives Mr. Johnson that option; true?
> A. Yes. The verbiage is saying that, yes.
> ...
> Q. So the board of directors for Transitional Living Corporation never intended to comply with its obligation under paragraph 9—under paragraph 7 of the management agreement, giving Mr. Johnson the option to exercise his stock option at the end of his

> employment contract because you guys never saw it as an
> obligation; is that true?
> A. That's right.
> Q. That's your testimony?
> A. Yes.
> ...
> Q. Did you ever tell Mr. Johnson that the board of directors did
> not intend to comply with paragraph 7 of the management
> agreement, giving him an option to exercise his stock option at the
> end of his employment contract?
> A. I don't recollect any such conversation.

Doc. 82-3 at 7 (p. 50-52).

Defendants oppose summary judgment on this claim, arguing that they "fully intended on honoring the stock option on the sale of TLC," consistent with their understanding of the Management Agreement's terms. *See* Doc. 96 at 24. According to Defendants, their honest dispute regarding the proper interpretation of the Management Agreement should not be converted into a fraud claim. *See id.*

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A mere scintilla of evidence in the non-movant's favor is not sufficient. *Anderson*, 477 U.S. at 252. However, the court must consider all the evidence in the light most favorable to the party opposing summary judgment. *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to

*particular parts* of materials in the record" to support their factual positions.  FED.R.CIV.P. 56(c)(1)(A) (emphasis added).  Alternatively, parties may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(B).  *See also Medlock v. United Parcel Service, Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard 'by identifying a lack of evidence for the nonmovant on [that] element.'" (internal quotation and citation omitted) (alteration in original)).  Materials cited to establish the presence or absence of a genuine dispute must be in a form that would be admissible in evidence.  FED. R. CIV. P. 56(c)(2).

The court need only consider the materials cited by the parties.  FED. R. CIV. P. 56(c)(3). In the event that a party fails to cite materials or otherwise properly address another party's assertion of fact, the court may consider the fact undisputed and, if the motion and supporting materials show that the movant is entitled to it, grant summary judgment.  FED. R. CIV. P. 56(e). The court is also empowered to grant summary judgment, if appropriate, independent of the motion after giving notice and a reasonable time to respond.  FED. R. CIV. P. 56(f).

## ANALYSIS

### A. Choice of Law

"In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause."  *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1260 (10th Cir. 2006).  New Mexico follows the choice-of-law rules set forth in the Restatement (First) of Conflict of Laws.  *See Ferrell v. Allstate Ins. Co.*, 144 N.M.

9

405, 421, 188 P.3d 1156, 1172 (2008).  This means, that New Mexico courts would generally apply *lex loci contractus*, or the law of the place of contracting, in contract actions and *lex loci delictus*, or the law of the place of wrong, in tort actions.  *See* Restatement (First) of Conflict of Laws at §§ 311, 377.

The parties agree that Arizona law governs Plaintiff's breach of contract claims.  *See* Doc. 82 at 14; Doc. 96 at 7-8 (containing no dispute that Arizona law applies to the breach of contract claims).  As to the fraud claim, however, Plaintiffs argue that New Mexico law applies, whereas Defendants contend, pursuant to the choice-of-law provision in the Management Agreement, that Arizona law governs.  *See* Doc. 82 at 14-15; Doc. 96 at 7-8.  Both parties cite to *Guidance Endodontics, L.L.C. v. Goodis*, 708 F. Supp. 2d 1209 (D.N.M. 2010) as support for their respective propositions.

The parties in *Guidance* agreed to a contractual provision stating that "'any dispute' arising under the Supply Agreement 'shall be governed by and construed according to the laws of the State of Delaware.'" *See* 708 F. Supp. 2d at 1223.  Neither party disputed the applicability of Delaware law, and neither party argued that Delaware law was somehow contrary to New Mexico public policy.  *See id.* at 1223, 1259.  The Honorable Judge James O. Browning of this District therefore applied Delaware law to all of the plaintiff's contract-related claims, including a claim of fraudulent inducement.  *See id.* at 1223.  Because neither party in *Guidance* challenged the application for Delaware law to the fraudulent inducement claim, and because neither party in *Guidance* disputed whether the fraudulent inducement claim was properly considered a contract claim, *Guidance* is not instructive in the present case.

Here, the parties disagree about the nature of the fraud claim, with Plaintiffs arguing it sounds in tort, triggering the *lex loci delicti* rule, and Defendants arguing that it is a contract

10

claim governed by the choice of law provision.  *See* Doc. 82 at 15; Doc. 96 at 10-11.

New Mexico case law provides that "[f]raud is a tort, rather than a breach of contract, claim."  *Heimann v. Kinder-Morgan CO2 Co., L.P.*, 140 N.M. 552, 558, 144 P.3d 111, 117 (Ct. App. 2006).  *Accord Williams v. Stewart*, 137 N.M. 420, 429-30, 112, P.3d 281, 290-91 (Ct. App. 2005) (distinguishing breach of contract actions from "the tort of fraud").  In a case concerning a similar fraudulent inducement to contract, the New Mexico Court of Appeals saw fit to hold a corporate officer individually liable for his role in the commission of the fraud, noting it was an intentional tort.  *See Kaveny v. MDA Enter., Inc.*, 120 P.3d 854, 858 (N.M. Ct. App. 2005).  Fraud is so fundamentally different from a breach of contract, that New Mexico courts typically will not allow parties to recover damages for both.  *See, e.g., Branch v. Chamisa Dev. Corp., Ltd.*, 223 P.3d 942, 947 (N.M. Ct. App. 2009) (noting that "where a party received something of value under a contract, if he seeks to rescind the same upon the ground of fraud, he must immediately, upon discovering the fraud, restore, or offer to restore all that he has received under the contract as a condition precedent to his right to rescind the same" (citing *Putney v. Schmidt*, 120 P. 720, 723 (N.M. 1911)).

Separate and apart from the New Mexico characterization of fraud or fraudulent inducement as a tort action rather than a contract action, the language of the parties' choice of law provision does not encompass fraudulent inducement.  The Management Agreement provides, "This agreement shall be governed by and in accordance with the laws of the State of Arizona."  *See* Doc. 96-1 at 4.  Plaintiffs' fraud claim is based on Defendants' alleged "multiple material misrepresentations to Plaintiffs for the purpose of inducing Plaintiffs to enter into the Management Agreement."  *See* Doc. 27 at ¶ 34.  Because Defendants' alleged misrepresentations occurred prior to the formation of the contract, they are not part of the

11

agreement and not subject to the choice-of-law provision governing "[t]his agreement."

Defendants offer the recent decision of *Mann v. Auto. Prot. Corp.*, 777 F.Supp.2d 1234 (D.N.M. 2011) in support of their contrary position. However, *Mann* concerns a forum selection clause rather than a choice-of-law provision like that at issue in the present case. *See* 777 F.Supp.2d at 1243. Thus, *Mann* involves a fundamentally different question than that at issue in the present case. Whereas it would frustrate judicial economy to try contract-related actions in one forum and tort actions in another forum, nothing prevents a single court from applying the law of two different states in a single lawsuit. The well-reasoned opinion of the Honorable Magistrate Judge Lourdes A. Martínez of this District in *Mann* is simply inapposite.

Pursuant to the parties' choice-of-law provision, Arizona law will apply to causes of action sounding in contract, but New Mexico will apply to tort actions, specifically, Plaintiffs' claim of fraudulent inducement.

### B. Summary Judgment is Not Appropriate on Plaintiff Johnson's Contract or Tort Causes of Action

The required elements of an enforceable contract under Arizona law are: (1) an offer; (2) acceptance; (3) consideration; and (4) "sufficient specification of terms so that obligations involved can be ascertained." *K-Line Builders, Inc. V. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983). "Although a party claims to accept an offer, the resulting contract is not binding if it is missing essential terms, or if its terms are not reasonably certain." *Dittmar v. Passanti*, Case No. 1 CA-CV 08-0793, 2010 WL 334987 at *6 (Ariz. Ct. App., Jan. 28, 2010) (citing *Savoca Masonry Co. v. Homes & Son Constr. Co.*, 542 P.2d 817, 820 (Ariz. 1975). "An agreement's terms are reasonably certain 'if the agreement that was made provides 'a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Id.*

(quoting *Schade v. Diethrich*, 760 P.2d 1050, 1057-58 (Ariz. 1988)).

Factual disputes preclude the Court from determining whether reasonable certainty exists with respect to the Management Agreement. On the one hand, the primary portion of the Management Agreement at issue, paragraph 7, appears to contain conflicting provisions. It first states that Plaintiff Johnson's 25,000 shares "shall be held by TLC in trust for him until the closing of the sale of TLC or substantially all of its assets." Doc. 82-11 at 3, ¶ 7. It states further that while Plaintiff Johnson may vote the shares and receive ordinary dividends thereon, "capital dividends or other capital distributions shall be held in the same trust along with the said shares." *Id.* From these statements, it appears the parties intended the sale of TLC to be a condition precedent to any benefit received from the shares.

Yet, paragraph 7 also provides that "Johnson has the right to exercise option to Sell shares at completion of Employment Contract at a minimum value of $24 per share or fair market value at time of material change of ownership of TLC, whichever is greater." *Id.* This suggests that Plaintiff Johnson may exercise his shares prior to the sale of TLC. Indeed, Defendant Hanley's testimony was unequivocal that paragraph 7 gave Plaintiff Johnson the right to sell shares at the end of his employment. *See* Doc. 82-3 at 4-5. The conflict within paragraph 7 indicates a lack of reasonable certainty regarding Johnson's ability to sell shares in the absence of TLC's hoped-for sale. There is also some question what the terms of the referenced Employment Contract are and whether Plaintiff Johnson fulfilled such terms.

When considered in the light most favorable to the Defendants, the evidence is not undisputed, and the Court therefore cannot grant summary judgment. A reasonable jury could interpret paragraph 7 either way. Moreover, because the meaning of paragraph 7, specifically Plaintiff Johnson's ability to sell his shares at the conclusion of his employment, is in question,

the Court cannot grant summary judgment on Plaintiff Johnson's claim for fraudulent representation.

## CONCLUSION

The parties' choice-of-law provision in the Management Agreement does not pertain to Plaintiff Johnson's claim for fraudulent representation. While Arizona law applies to Plaintiffs' contractual claims, the fraud claim will be determined according to New Mexico law. Summary judgment is not appropriate on any of Plaintiff Johnson's claims at issue in the present motion because there are genuine issues of material facts, including but not limited to the meaning of the Management Agreement, paragraph 7.

Plaintiff David C. Johnson's Motion for Partial Summary Judgment [Doc. 83] is therefore **DENIED**.

_____
UNITED STATES DISTRICT JUDGE